**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Kathy Cannon, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 22-89 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| W.W. FRIEDLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Currently pending before the Court is Defendant's Motion for Summary Judgment, Docket No. 35, in this employment discrimination lawsuit brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.*; and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA").[1]  *See generally,* Docket No. 9 (Plaintiff's Amended Complaint).  In her primary claim, Plaintiff alleges that Defendant, having recently inquired of her retirement plans and details of her job skills/roles, pretextually terminated her employment and replaced her with a significantly younger employee.  (*Id.* at 14-20, Counts I and II). Secondarily, she alleges gender discrimination.  (*Id.* at 20-21, Counts III and IV).  Defendant responds that Plaintiff's termination (at age 63) was a legitimate business decision made when Defendant discovered she had committed "serious misconduct involving Company records and funds" in her position as office

---

[1] As noted in Section IV, *infra*, the PHRA is construed consistently with interpretations of the ADEA and the Court of Appeals for the Third Circuit has determined that a single analysis of Plaintiff's claims under both statutes (hereafter the "ADEA") is appropriate.

manager, and Plaintiff fails to sufficiently evidence a claim of either age or gender discrimination.[2] *See generally*, Docket No. 36. *See also* Docket No. 35-11; Docket No. 37 at 2.

Defendant seeks summary judgment in its favor on Plaintiff's claims in their entirety. Upon careful consideration of the parties' submissions and the evidence of record, and for the reasons set forth below, Defendant's motion is denied as to Plaintiff's ADEA claim of age discriminatory termination (Counts I and II) and granted as to her remaining claims.

In brief, this action presents material fact questions which preclude summary judgment on Plaintiff's claim for age discriminatory termination under the ADEA. A jury could reasonably find that the record evidence, viewed under the currently applicable standards, sufficiently supports Plaintiff's claim to reach a verdict in her favor. A jury could also quite reasonably find, however, that there is insufficient evidentiary support for this claim and that Defendant's termination of Plaintiff's employment was a legitimate business decision based on considerations other than her age. Defendant is entitled to summary judgment on all other express or suggested claims.[3]

---

[2] The Court notes that, although Plaintiff was employed by Defendant for more than 42 years, the record suggests fraught relationships/interactions between Plaintiff and Defendant's owner (and other employed family members) in the months preceding her early August 2020 (first pandemic summer) termination.

[3] Plaintiff's Amended Complaint and Brief in Opposition to the pending motion include a briefly-stated and under-developed last page(s) claim for gender discrimination ultimately premised on Plaintiff's allegations that (a) males employed in Defendant's garage were treated differently than females who worked in the office and (b) Defendant's owner, a male, assumed Plaintiff's work in a brief interval between her termination and her replacement by a younger woman. *See generally* Docket No. 9; Docket No. 40 at 19-20 (stating, as Brief in Opposition's Section C, that Plaintiff "sets forth a cognizable claim for gender discrimination" in that: (a) "In particular, male employees who worked in the garage 'clocked out' for lunch while [Plaintiff] was forced to eat lunch at her desk while continuing to work" and (b) Plaintiff "was initially replaced by a male"); Docket No. 41 at ¶ 34. *See also* Section IV, *infra*.

The Amended Complaint also includes/retains further largely conclusory/unsupported claims - or often more accurately, mentions – of hostile work environment, discrimination, retaliation and harassment premised (to the extent any factual context/support is provided) largely on Defendant's failure to follow Pennsylvania's early-Covid masking mandate. The Court notes that although Defendant's employee policy provided means, the record appears devoid of evidence that Plaintiff made [or conversely, received] any employment-related complaints prior to her March-July, 2020 personal difficulties with owner's spouse, objections to Defendant's failure to enforce masking, and the rapid devolution of her employment circumstances). *Cf.* Docket No. 10 at 16. The Court also notes that the parties' pleadings appear to reference Plaintiff's Right to Sue letter but not the scope of her underlying EEOC Charge.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.    Factual History

The following facts are relevant, evidenced of record and read in the light most favorable to Plaintiff, as non-movant.  *See generally* Docket No. 9; Docket Nos. 35-37 (Defendant's Motion, Brief in Support, and Concise Statement of Material Facts ("CSMF")); Docket Nos. 40 and 41 (Plaintiff's Brief in Opposition and CSMF); Docket Nos. 44 and 45 (Defendant's Reply Brief; Defendant's Response to Newly Alleged Facts).  Evidentiary submissions were filed as exhibits to the parties' pleadings.

The relevant factual background is largely confined to circumstances/events just prior to and during Plaintiff's termination from employment in early August, 2020 (*i.e.*, during the first year of the Covid pandemic).  A significant number of these material facts are, however, contested and will await the jury's credibility determinations.

Plaintiff was employed (apparently uneventfully and at-will) for 42 years (beginning in 1978) as office manager (which work included running the office, accounting and training/oversight, payroll, and phones), by Defendant - a small, second- generation family-owned business specializing in trucking parts and repair, located in Somerset, Pennsylvania.  The company was owned by Mark Friedline (hereafter "Owner") who participated in its

---

In addition, Plaintiff confines her Brief in Opposition to her claims for age discriminatory termination and the gender discrimination specified above.  The pending motion's implication of other potential Constitutional rights violations asserted, mentioned or suggested in the Amended Complaint is left unaddressed.  *Id.  See also* Docket No. 36 at 20, 22 (asserting that claims for hostile work environment should be dismissed); *cf. id.* at 1 (asserting that Plaintiff "withdrew her retaliation claim" in her Amended Complaint).

Finally, the Court must note that Defendant's Conclusion to its Brief in Opposition both (a) further suggests its non-pursuit of claims beyond that for age-based termination (and insufficiently supported gender discrimination) and (b) reflects, as elsewhere, an over-reliance on and inattentive adoption of "standardized/block" pleading.  *See* Docket No 40 at 21 ("[I]t is therefore respectfully submitted that W.W. Friedline's Motion for Summary Judgment be DENIED.  "[T]here **[are]** genuine dispute[s] as to [certain] material fact[s]" regarding Great Arrow's proffered explanations for Plaintiff's termination.") (emphasis, brackets, errors and absence of citation in original).

management/operations until his death from Covid in November, 2020 (*i.e.*, shortly after Plaintiff's August, 2020 termination). (Docket No. 9 at ¶¶ 13-14; Docket No. 10 at 17; Docket No. 35-4; Docket No. 37 at ¶¶ 2-5; Docket No. 41 at ¶ 3).

In early March 2020, shortly before Pennsylvania Governor Wolf's Covid-related shutdown orders, another of Defendant's "administrative personnel", Russ Lyons ("Lyons"), whom Plaintiff had trained and who was responsible for Defendant's accounts receivable, voluntarily left employment. Owner's spouse, then Susan Friedline (hereafter "Mrs. Friedline"), "assumed the vacated position" when Lyons gave notice, and he trained her in his "job basics" for his remaining days. Plaintiff was then tasked and burdened by the work of training/assisting Mrs. Friedline with her new position,[4] completing "projects" assigned by Owner, and continuing to perform her other office management/accounting responsibilities. (Docket No. 9 at ¶¶ 17-25; Docket No. 10 at ¶ 19; Docket No. 35-5 at 1-4; Docket No. 35-7 at 19-20; Docket No. 37 at ¶¶ 7-11).

In April, when in-person work was allowed to resume in Pennsylvania subject to restrictions including a mask mandate, Plaintiff (in concern for her age) agreed to return to office work only with others masked. Although only Plaintiff and Mrs. Friedline were then working in-office, difficulties immediately arose as to their work schedules, as the latter declined to mask.[5]

---

[4] Plaintiff continued to perform what had been Lyons' customer statements work until Mrs. Friedline was sufficiently competent to assume that work in the beginning of July. (Docket No. 35-5 at 4). Between March and July, 2020 Plaintiff made several oral complaints to Owner regarding difficulties with training Mrs. Friedline and the latter's ongoing errors. (Docket No. 35-7 at 18).

[5] The record appears to indicate that only approximately four of the usual eight garage workers returned to work at that time, the others taking voluntary layoff while there was less work to be done, and that Mrs. Friedline and Plaintiff were the only two employees in the office, which was located in a separate building/house. *See* generally Docket No. 41-3. It does not reference whether any other employee(s) objected to Defendant's failure to comply with the mandate then in place. *Cf.* Docket No. 35-7 at 8 (other employees/non-employees were permitted to be present in Plaintiff's office space without masking).

Plaintiff's health concerns were addressed for an interval by Owner's implementing a staggered-hours schedule.[6]  Sometime thereafter, however, Mrs. Friedline began working in the office at the same time as Plaintiff, unmasked.[7]  On an unspecified date, Owner and Mrs. Friedline then came to the office (unmasked) during Plaintiff's scheduled time to collect/consult the accounting, payroll, tax and other bookkeeping records maintained by Plaintiff; Owner also directed Plaintiff to list and describe her job responsibilities, and commented that training a replacement for her would take over a year.  On another occasion, Mrs. Friedline was accompanied by her unmasked school-aged children who ran and laughed while assisting their mother in cleaning/moving things from the office to a garage.  Plaintiff's complaints about this to Owner and his spouse were ignored, as were occasions observed by Owner in which Mrs. Friedline yelled at Plaintiff and treated her "disrespectful[ly]".  (Docket No. 9 at ¶¶ 26-37; Docket No. 35-5 at 3-5).

On Monday, July 27, 2020, Owner told Plaintiff his spouse had complained that Plaintiff was uncooperative and inadequately training her.  He asked Plaintiff, then 63, if she "still planned to wait" and retire at 65, and then suggested that she might "be leaving earlier" or be required to work with someone else hired into the office whose personality "may not mesh" and Plaintiff might, therefore, not want to "hang around".  (Docket No. 9 at ¶¶ 38-43).[8]

Within a few days, on Thursday, July 30th, Owner and his adult daughter, Keri Friedline ("Ms. Friedline") – who worked full-time in the Parts Department - confronted Plaintiff with an

---

[6] *Cf.* Docket No. 35-5 ("[T]he agreement was to wear a mask if we were both there, and if not, we were staggering hours so there wouldn't be two people together in the same office, then we wouldn't have to wear our masks.").

[7] *Cf.* Docket No. 35-5 at 5 (stating that it was difficult to maintain a shift schedule because Mrs. Friedline frequently could not keep her hours as scheduled).

[8] *Cf.* Docket No. 35-5 at 12 (asserting that in Fall 2019, Owner had been glad to know that Plaintiff would not retire until age 65 and indicated he would like to keep her on as a consultant thereafter); *cf. also* Docket No. 41-3 at 18 (Mrs. Friedline's testimony that Owner "found" the woman who later replaced Plaintiff, Susan Miller, in July, 2020, as she was "going to replace" Mrs. Friedline, who at that time intended to "quit working").

accusation that she had intentionally modified Ms. Friedline's timecard and underpaid her for the most recent time period.[9] Plaintiff "reviewed Keri's timecard in the file", acknowledged a two-hour clerical error, and indicated it would be corrected in the next payroll. Owner and Ms. Friedline (unmasked and shouting in close proximity) continued to accuse Plaintiff of intentional falsification of the timecard, and Ms. Friedline showed Plaintiff a purported "copy" of her submitted timecard made by Mrs. Friedline. This copy differed by many hours from the one Plaintiff retained and reviewed and many of the entries on this "unmodified", pre-submission timecard were handwritten. (Docket No. 9 at ¶¶ 44-50, 60; Docket No. 37 at ¶¶ 17-21; Docket No. 41 at ¶ 25; Docket No. 41-3 (Ms. Friedline's 2020 time cards).[10]

The following day, Friday, July 31st, Plaintiff arrived to work for her 11:30 shift but decided to wait in her car when she observed Mrs. Friedline in the office, and after an interval returned home and turned off her phone for the weekend.[11] The following Monday morning, August 3rd, she discovered a text and voicemail from Owner indicating he wanted to speak to her immediately.[12] On going to the office at 7:45 a.m., as scheduled, Plaintiff found the locks had

---

[9] Defendant's manual timecard system relied on employees' punching a time clock in and out. When that was not possible, or an employee forgot, the employee handwrote the time on their card. Plaintiff's payroll responsibilities included completing missing timecard information from other business records and verifying and making handwritten corrections to employee entries/discrepancies as needed. Plaintiff manually calculated and processed Defendant's payroll. *See e.g.*, Docket No. 35-6 at 9; Docket No. 37 at ¶ 13; Docket No. 41 at ¶¶ 13-15.

[10] Mrs. Friedline's photocopying of a timecard and the subsequent challenge to Plaintiff's veracity arose from complaint(s) to Mrs. Friedline by Owner's daughter's fiancé that Ms. Friedline was regularly working 12 hour days but was not being paid for her overtime. (Docket No. 35-6 at 14-15; Docket No. 37 at ¶ 18 ("Keri's fiancé complained that Keri seemed to be working overtime . . . ."). The evidentiary record leaves obvious material fact and credibility questions regarding, *e.g.*, potential relationship factors in the disputed attribution of alleged handwritten modifications to Ms. Friedline's timecard. The pleadings do not indicate whether Ms. Friedline was subsequently compensated for substantial overtime hours, and Defendant's forensic accountants' report appears to exclude it from its timecard anomalies review. *See* n. 14, *supra*.

[11] (Docket No. 9 at ¶¶ 64-67). *But cf.* Docket No. 41 at ¶ 24 (asserting that a "door was slammed practically in [Plaintiff's] face" when she attempted to enter the office that day) (citing Plaintiff's deposition testimony).

[12] The record reflects two texts from Owner to Plaintiff between 2:19 and 3:56 p.m. the afternoon of Friday, July 31st, and no further text until the afternoon of Monday, August 3rd, notifying her that she was placed on unpaid administrative leave and that the "errors" raised on the 30th were being reviewed. (Docket No. 35-10). Plaintiff attests

been changed. Her call to Owner being unanswered or returned, she waited for a while and then returned home. She later received a message from Owner that she had been placed on Administrative Leave effective that day. The following Monday, August 10, she was notified by a letter from Defendant's counsel that her employment was terminated effective that day for "serious misconduct". *See* Docket No. 9 at ¶¶ 51-62. *See also* Docket No. 35-11 (Termination Letter providing that: "Upon further review [of the accounting anomalies "preliminarily discussed" with you by Owner on July 30], please be advised that your employment with the Company is hereby terminated, effective immediately as of the date of this letter; it appearing that you have engaged in serious misconduct involving Company records and funds.").[13]

Defendant subsequently – *i.e.*, sometime after Plaintiff's termination - further accused Plaintiff of (a) making additional underpayments/alterations regarding Ms. Friedline's timecards; (b) taking an unauthorized per-pay-period performance bonus or overpaying herself approximately $440 in 2020 even if said bonus was Owner-authorized; and (c) paying herself for vacation time to which she was unentitled. *See* Docket No. 37-9 (October 23, 2023 forensic accounting analysis report prepared for Defendant); Docket No. 44 at 7-8.[14]

---

that on becoming aware of Owner's communications on Monday morning, she attempted to reply via the office, Owner's and Mrs. Friedline's cell phones but was unable to reach either individual or obtain a response. (Docket No. 41 at ¶ 24).

[13] The only timecard change identified and relied upon in Plaintiff's termination was Ms. Friedline's timecard for the weeks of July 5-18, 2020. This timecard assertedly "shorted" the number of hours worked/reported, and contained Plaintiff's handwritten changes from the photocopy represented by Defendant to be that submitted by Ms. Friedline. (Docket No. 35-6 at 15-16; Docket No. 41 at ¶ 18).

[14] The Court notes that this report on the analyst's review of Defendant's payroll/wage documents for anomalies in wages paid to Plaintiff "or other employees" reflects (a) no other employee anomalies, (b) speculation in the absence of documentation regarding the timing of Plaintiff's taking payment for vacation and whether she was entitled to full or pro-rata vacation time, (c) that the analyst deemed the frequency, means of calculation and general payment of a bonus to Plaintiff – a non-revenue-generating employee - "unusual" and (d) the analyst's express notation that it had no handwriting expertise and did not know who modified Ms. Friedline's 2020 timecards, as to which it found four instances of mathematical errors and three timecards reflecting "noticeable alterations". The analyst concluded that the timecards for the "13 pay periods" reviewed for Ms. Friedline were "shorted" 9.07 hours of pay from January

7

In response, Plaintiff first maintains that she did not modify any employee timecard, including those of Ms. Friedland, and made only an inadvertent clerical error of two hours which would have been corrected; she disputes that authenticity/accuracy of the timecards provided by Defendant to its forensic accountants.  Second, Plaintiff states that in 2020 her hourly rate was $18.50 but that sometime in 2018 or 2019 Owner had authorized a "performance bonus" of $220 per paycheck, intended to represent an hourly increase of $2.75; she also states that her increase was in this form to avoid difficulties that might occur if Lyons became aware of a substantial hourly rate disparity.  Plaintiff further maintains that her bonus approval was documented, as were other employee raises (including some other employees' performance bonuses over the years), by a memo with name, date, and the change in wage or benefit, which was placed in the manual/paper payroll records retained in the office as to which Defendant maintained subsequent control. [15] Third, Plaintiff maintains that she never took all, let alone more than, her allowed four weeks vacation.  (Docket No. 35-5 at 8-9, 14; Docket No. 41 at ¶¶ 16-21, 25-30).

---

through July 2020.  (Docket No. 35-9; Docket No. 41 at ¶ 22).  The Report appears to indicate that the analyst's review was exclusive of the July pay period timecard(s) underlying Plaintiff's termination.  (Docket No. 35-9).

*Cf.* Docket No. 40 at 10 (Plaintiff's Brief in Opposition noting that "[t]here is no testimonial or documentary evidence that the conclusions of Friedline's expert were made contemporaneous with the decision to terminate [Plaintiff]'s employment. To the contrary, Friedline's expert indicates that the report – and the investigation into these records – was commissioned during the course of the litigation. . . . Accordingly, the report itself indicates that the findings were not part of Friedline's decision to terminate Plaintiff.").

In addition, although Defendant also subsequently accused Plaintiff of intentionally reducing the actual hours worked by other employees, the record appears to lack either a motivational basis for this alleged conduct or, more importantly, evidentiary support.  *Cf.* Docket No. 41 at ¶¶ 25-26.

[15] Docket No. 35-5 (further testifying that Owner sometimes made this adjustment "later in the year" but then "knew what the total figure should be for year end"); *id.* (Plaintiff was unsure without the necessary records whether she was paid for entire years (vs. not receiving performance bonuses during her regular seasonal layoffs); *id.* (stating that Owner had used this same method of salary increase "with a mechanic and also a couple of truck drivers over the years"). The parties' briefing does not appear to reference discovery/records as to Defendant's workforce performance bonus practices.  The Court notes, however, that the question relevant to Plaintiff's claim of age discriminatory termination is whether the reason given for that termination was pretextual.  *See* Section IV, *infra*.  *See also* Docket No. 41 at ¶ 27 (absence of evidence that forensic accountants' conclusions were contemporaneous with Defendant's decision to terminate Plaintiff's employment); n. 14, *supra*.

Plaintiff was replaced as office manager by Susan Miller at the end of November, 2020, shortly after the death of Owner, Mark Friedline, who handled accounts payable until his passing.[16] The notations of Miller's pre-hiring process indicate that she was 55 years old and "hope[d] to work 13 more years". (Docket No. 41 at ¶¶ 31-32).

As this factual history indicates, the evidentiary record contains substantial lack of clarity and disputation of material facts that will confront the jury – including as to Defendant's payroll and other business records and sometimes the absence thereof. Fact finding, should the matter proceed to trial on the remaining claim, may also be affected by applicability of the Dead Man Statute to testimony regarding statements made by Mark Friedline prior to his death in November, 2020. *See* Docket No. 36 at 7-8 (discussing application of same) (citing *Punxsutawney Mun. Airport Auth. V. Lellock*, 745 A.2d 666, 670 (Pa. Super. 2000); *Prescott v. R&L Transfer, Inc.*, 2015 U.S. Dist. LEXIS 182007 (W.D. Pa. April 9, 2015)); Docket Nos. 44 at 6 and 35-6 at 12.

## B.    Procedural History

Plaintiff commenced this action by Complaint filed on June 6, 2022, and amended on November 7, 2022. The Amended Complaint asserts the following claims against Defendant: Counts I and II – Age discrimination under the ADEA and the PHRA, respectively,[17] and Counts III and IV – Gender discrimination under Title VII and the PHRA, respectively. (Docket No. 9). The parties completed fact discovery as to Plaintiff's claims and Defendant filed its Motion for

---

[16] *Cf.* Docket No. 41-3 at 17-18 (Miller was not hired immediately on Plaintiff's termination because Defendant hired its accountant to help it understand the various aspects of Plaintiff's position and "figure out the process" of "how to do" it; accountant's employee, Christina Bitner, then worked along with Owner; and from August to November 2020, "many people [were] trying to figure out how to do [Plaintiff's] job"); *id.* at 19.

[17] As set forth in n. 3, *supra*, Plaintiff's Brief in Opposition primarily addresses only her claim of age discriminatory termination, concluding with a brief one-page advancement of her claim of gender discrimination. (Docket No. 40). And as explicated herein, the Court finds Plaintiff's gender discrimination and other initially asserted/suggested claims unmaintainable under the applicable standards and given the evidence of record.

Summary Judgment, Brief in Support, and Concise Statement of Material Facts. (Docket Nos. 35-37). The parties' Briefs in Opposition, Responses and Replies being filed at Docket Nos. 40-41 and Docket Nos. 44-45, the motion for summary judgment is thus fully briefed and ripe for disposition.

## III.    APPLICABLE STANDARDS OF LAW

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party,[18] the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a) & (c)(1)(A). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986). In

---

[18] *See e.g.*, *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007) (noting that the court must interpret the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor).

*Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id*. at 249-50 (internal citations omitted).  *See also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

## IV.    ANALYSIS

### A.    Plaintiff's Evidence Is Sufficient to a Reasonable Jury's Finding of Discriminatory Age-Based Termination Under the ADEA and PHRA

The PHRA is construed consistently with interpretations of the ADEA and the Court of Appeals for the Third Circuit has determined that a single analysis of Plaintiff's claims under both statutes (hereafter the "ADEA") is appropriate.  *Davis v. Pittsburgh Pub. Schs*., 930 F.Supp.2d 570, n.12 (W.D. Pa. 2013); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citations omitted).   Accordingly, Plaintiff's claims under Counts I and II are collectively discussed hereafter by reference to the ADEA.

#### 1.  Applicable Burden-Shifting Framework

Plaintiff claims that Defendant discriminated against her based on her age when it terminated her, in violation of the ADEA.  The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." *See e.g., Willis*, 808 F.3d at 643-44 (quoting 29 U.S.C. § 623(a)(1)). And where, as here, a plaintiff relies on circumstantial evidence, courts apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Willis*, 808 F.3d at 644 (citation

omitted).[19]    Under this framework, a plaintiff must first establish a prima facie case of age discrimination by pointing to evidence supporting that she: (1) is at least forty years old; (2) suffered an adverse employment decision; (3) was qualified for the position in question; and (4) was ultimately replaced by someone sufficiently younger so as to support an inference of discrimination. *Id.* (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc)); *Britton v. Oil City Area Sch. Dist.*, 744 F.App'x 53, 55-56 (3d Cir. 2018).[20]

The question of whether a plaintiff has established her prima facie case is a question of law to be determined by the court.  *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)).  When that determination is made in her favor, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Willis*, 808 F.3d at 644 (citing *McDonnell Douglas,* 411 U.S. at 802). Once the employer carries its burden, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons but were merely a pretext for discrimination.  *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). At all times, the ultimate burden of proving intentional discrimination remains with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  "To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of

---

[19] Although the Supreme Court formulated the *McDonnell Douglas* framework in cases involving Title VII, the United States Court of Appeals for the Third Circuit has consistently applied that framework in cases where direct evidence of discrimination is not presented and which arise under federal antidiscrimination statutes, including the ADEA. *Smith v. City of Allentown*, 589 F.3d 684, 689–91 (3d Cir. 2009); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007); *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300–01 (3d Cir. 2004); *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

[20]  A prima facie case raises an inference of discrimination sufficient to shift the burden of production to the defendant because the court presumes that certain actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).  *See also Venter v. Potter*, 694 F.Supp.2d 412, 422 (W.D. Pa. 2010), *aff'd*, 435 F.App'x. 92 (3d Cir. 2011).

the evidence, that age was the 'but-for' cause of the adverse employment action." *Willis*, 808 F.3d at 644 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)); *Britton*, 744 F.App'x at 56 (same). *See also Jeffery v. Erie Cnty. Pennsylvania,* 2024 WL 1257347, at *2 (W.D. Pa. Mar. 25, 2024); *Murphy v. Ctr. For Emergency Med. of W. Pa*., 944 F. Supp. 2d 406, 428 (W.D. Pa. 2013) ("It is not sufficient to simply show that age was a motivating factor.").

### 2. Plaintiff's Prima Facie Case

Defendant concedes that Plaintiff that (1) was at least forty years old (she was 63); (2) suffered an adverse employment decision (termination); and (3) was qualified for her position.  It disputes only the fourth factor of Plaintiff's prima facie case, *i.e.*, that she was replaced by someone sufficiently younger so as to support an inference of discrimination.  *See Willis*, 808 F.3d at 644. More particularly, Defendant asserts that the eight-year age difference between Plaintiff (63) and Susan Miller (55) was – absent more - insufficient to a prima facie case of age discrimination. (Docket No. 36 at 4-5) ("[A]bsent other evidence, an age difference of less than ten years is not sufficient to support an inference of discrimination.") (citing *Robinson v. City of Philadelphia*, 491 F. App'x 295, 299 n. 1 (3d Cir. 2012)).

 "A sufficient age difference between Plaintiff and the person who was given the [promotion/position] from which a fact finder could reasonably conclude that the employment decision was made on the basis of age is sufficient to meet the fourth element of an ADEA prima facie case." *Kupetz v. Pittston Area Sch. Dist.,* 2018 WL 3833505, at *4 (M.D. Pa. Aug. 13, 2018) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 730 (3d Cir. 1995) and *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 792 (3d Cir. 1985)).  The Court finds Susan Miller's age difference sufficient. *See Showalter v. Univ. of Pittsburgh Med. Ctr*., 190 F.3d 231, 236 (3d Cir. 1999) (finding age differences of 8 and 16 years between plaintiff and retained employees sufficient); *id.* (citing

*Sempier*, 45 F.3d at 730, as "holding that the fourth prong of a prima facie age discrimination case was satisfied where plaintiff was replaced by two individuals – one who was four years younger than plaintiff and the other who was ten years younger"). *See also id.* ("In order for a plaintiff to satisfy the 'sufficiently younger' standard, we have noted that there is no 'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a five year difference can be sufficient,  . . . a one year difference cannot.'") (quoting *Sempier,* 45 F.3d at 729).

As the Factual History of Section II(A) indicates and the remainder of this Section IV(A) relates, the case *sub judice* is readily distinguishable from the earlier case in this District on which Defendant primarily relies.  *See* Docket No. 36 at 5 (discussing *Litzenger v. Allegheny Lutheran Soc. Ministries*, 2017 WL 3089022, *14 (W.D. Pa. July, 2017).  In *Litzenger*, the Court observed a seven-year age difference to be insufficient in the course of succinctly concluding that an elder care nurse who had received multiple misconduct warnings for resident abuse identified no evidence from which a factfinder could reasonably conclude employer's termination was pretextual.  *Id.*[21]  Defendant's analogy to *Litzenger* hinges on its assertion that here too the plaintiff has failed to offer "other evidence" in support of her claim - an assertion the Court must reject.

---

[21] *See also Umbria v. Valley Forge Casino Resort*,  2022 WL 507483, at *5 (E.D. Pa. Feb. 18, 2022) (finding insufficient age difference of less than five years younger where no other facts of record supported an inference of discrimination):

> There is no bright-line rule defining what age differential is required to meet the "sufficiently younger" standard. Some courts have found an age differential of slightly less than five years to be sufficient to satisfy the standard. *See, e.g., Carter*, 228 F. Supp. at 904 (finding a differential of four years and five months to be sufficient); *Robinson v. Matthews Int'l Corp.*,  2009 WL 735876 (W.D. Pa. Mar. 20, 2009), *aff'd*, 368 F.App'x 301 (3d Cir. 2010) (finding a four-year age differential to be sufficient). However, most courts within this circuit have required an age differential of at least five years. *See, e.g., Gutknecht v. SmithKline Beecham Clinical Labs., Inc*., 950 F. Supp. 667, 672 (E.D. Pa. 1996); *Knox v. Fifth Third Bancorp*, 2014 WL 359818, at *13 (W.D. Pa. Feb. 3, 2014); *Martin v. Healthcare Business Resources*, 2002 WL 467749, at *5 n.7 (E.D. Pa. March 26, 2002); *Lyons v. Cty. Of Bethlehem*,  2004 WL 540452, at *6 (E.D. Pa. Mar. 3, 2003).

To the extent the parties' briefing may suggest, in the alternative, that Owner's assumption of Plaintiff's duties from the time of her termination in August, 2020 until his death a few months thereafter precludes Plaintiff's establishment of this element of her prima facie case, it is misguided.  See Section II(A) and n. 9, supra. The Court observes, however, that the assumption by family members of substantial business duties (both Lyon's and Plaintiff's), and a voluntary

### 3. Defendant's Proffered Legitimate Non-Discriminatory Reason

The burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for its employment action, and said burden is "relatively light." *Fuentes*, 32 F.3d at 763. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Rather, the inquiry concerning whether Defendant met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily precedes the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion" that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Fuentes*, 32 F.3d at 763.

Defendant asserts that Plaintiff was discharged on August 10, 2020 "due to accounting discrepancies" for which she was placed on unpaid administrative leave on August 3, 2020. (Docket No. 36 at ¶¶ 25-26). And it has met its light burden by presenting evidence, *e.g.*, payroll documents and testimony, in support. Since Defendant has met its burden, the Court turns its analysis to step three of the *McDonnell Douglas* test.

### 4. Plaintiff's Evidence of Pretext

To overcome Defendant's proffered legitimate non-retaliatory reason for its action, the burden shifts to Plaintiff to prove by a preponderance of the evidence that said reason was *not* the true reason for Defendant's adverse action but was merely a pretext for discrimination. *Willis*, 808 F.3d at 644. To meet this burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

---

layoff reduction in garage employees, during the first year of the pandemic may inform a jury's reasonable fact finding regarding, *e.g.*, the economic, relationship or other circumstances and motive(s) underlying Plaintiff's termination.

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)).[22] These two prongs of the *Fuentes* test are *distinct*. *Keller,* 130 F.3d at 1108–13.  Under this Court's analysis of the first independent prong, Plaintiff has met her burden to present evidence of pretext and disputed factual issues remain which preclude summary judgment.

The first prong of the *Fuentes* test focuses on whether Plaintiff has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reasons for the adverse action. To satisfy this prong and discredit the employer's proffer, Plaintiff cannot simply show that Defendant's decision was wrong or mistaken, since the factual dispute at issue is whether the employer was motivated by discriminatory animus.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes,* 32 F.3d at 765 (quoting *Ezold*, 983 F.2d at 531, 533) (other internal citations omitted).[23]

---

[22] As the Court of Appeals has explained:

> To establish such circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, *viz,* each reason was "a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). This proof of pretext then may be combined by the factfinder with the evidence used to support the plaintiff's prima facie case of age discrimination, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff because of [her] age. *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749.

*Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (footnote omitted).

[23] *See also Keller*, 130 F.3d 1101, 1109 (3d Cir. 1997) ("'The question is not whether the employer made the best, or

Plaintiff has presented evidence from which a fact finder could reasonably disbelieve Defendant's articulated reasons for her termination based primarily on their degree of weakness and implausibility.  Summarizing the evidence in the light most favorable to Plaintiff:

Defendant employed Plaintiff as a key and trusted member of its small family business for over four decades (*i.e.*, from Plaintiff's early 20's through her early 60's – essentially her entire working life).  Plaintiff managed Defendant's office, payroll, accounts payable (directly) and receivable (through training/oversight of Lyons and then Mrs. Friedline), and performed/supported other financial matters.[24]  She routinely and uneventfully (*i.e.*, without incident of discrepancy) verified/corrected/completed employee time records, processed payroll, and wrote checks.  In early 2020, Defendant's accounts receivable employee resigned and Defendant's business – like others – was temporarily closed in response to rising Covid cases.  When "essential" businesses reopened, Plaintiff worked (under the personal stress experienced by most people at that time) to perform her normal responsibilities, train (and manage a difficult relationship with) Owner's wife, assume some of Lyons' accounts receivable work, and complete Owner's assigned projects.  For reasons unknown/unclear from the briefings, at some time thereafter Owner and his wife required the provision for review of (a) Defendant's office financial/employment records maintained by Plaintiff and (b) Plaintiff's detailed itemization of her own job responsibilities.[25]  Assertedly on inquiry from Owner's daughter's fiancé regarding a discrepancy between her hours at work and her pay, Mrs. Friedline photocopied a July 2020 two-week pay period timecard represented by Ms. Friedman to be the one submitted to Plaintiff.  Ms. Friedline was subsequently paid for fewer

---

even a sound business decision; it is whether the real reason is [discrimination].'") (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).

[24] *See* Docket No. 35-7 at 17 (listing administrative and accounting functions performed by Plaintiff).

[25] *Cf.* Section II(A) at 5 & n. 8, *supra*.

hours, and Owner and Ms. Friedline confronted Plaintiff in the manner recounted in Section II(A), *supra*. Plaintiff attests that she consulted the timecard submitted to her and acknowledged a clerical error of two hours, which would have been corrected in the next pay period. She disavowed wrongdoing and disavowed that the asserted copy of another timecard showing far more hours accurately reflected the timecard submitted.

The record leaves obvious material fact questions regarding, e.g., the alteration and possession of the timecard documents submitted (*e.g.*, the possession of/relationship between the timecard in Plaintiff's payroll file and the photocopy assertedly made and presented to her), the relationship of allegedly substantial overtime hours shorted for that pay period and the Defendant's forensic accountants' subsequent calculation that Ms. Friedline was shorted a total of 9.05 hours in 2020. More generally, the evidentiary record does not support unambiguously or with unquestionable credibility Defendant's stated reason for termination: that Plaintiff had committed serious misconduct by intentionally altering Ms. Friedline's July pay period timecard as accused. In addition, the parties' filings and record citations do not reflect, *e.g.*, Defendant's (a) consideration of the possibility of error in the context of Plaintiff's workload and working conditions at that time,[26] (b) pre-termination inquiry/fact gathering and substantiation of the alleged or additional timecard (or other) irregularities (as to Ms. Friedline or more broadly), or (c) desire to resolve its concern through discussion/dialog or any course of action short of accusation of financial fraud and summary firing.[27] Thus, while it is certainly conceivable that a (perhaps

---

[26] *Cf.* Docket No. 35-7 at 20 (Plaintiff expressed concerns to Owner regarding the "long hours she was required to work, and how her normal job duties were being adversely affected by the additional responsibilities"); *id.* at 27 (attesting that in 42 years, "Plaintiff virtually never committed a clerical error or mistake"). *Cf.* Docket No. 41-3 at 13 (Mrs. Friedline's testimony that, to her knowledge, there had never before been an employee timecard-payment discrepancy issue).

[27] *Cf.* Docket No. 37-11 (August 10, 2020 termination letter forbidding Plaintiff from "enter[ing] upon Company premises for any reason whatsoever without . . . written permission" and "direct[ing her] to surrender any and all Company belongings in [her] possession including, without limitation, all Company keys, key fobs, credit cards,

relatively minor)[28] underpayment of hours worked by Owner's daughter, Ms. Friedline, was Defendant's legitimate business cause for Plaintiff's termination, it is also reasonably conceivable that it was not. *Cf.* Docket No. 40 at 10 ("[T]his is not the type of so-called transgression that would cause an employer to end a 40-year employment relationship – not, unless, the proffered explanation is merely a pretext."). *Compare* Docket No. 44 at 7 (Defendant's averment that Plaintiff's "[s]horting an employee two (2) hours of time . . . would be enough . . . to justify termination" as it "is a critical mistake for an employee who is in charge of ensuring employees are paid for the time they work, *particularly one who held the position for decades*) (emphasis added). [29]

Because a reasonable jury could find that Defendant's averments that its previously-trusted life-long employee was summarily discharged for "serious misconduct involving company records and funds" raise a question of discriminatory intent, summary judgment "must be approached with caution." *Lowe v. Philadelphia Newspapers, Inc*., 594 F. Supp. 123, 128 (E.D. Pa. 1984). When, as here, the Court concludes that a defendant's proffered reason for terminating Plaintiff's employment raises material fact questions and credibility issues which preclude summary judgment, the Court must then respect "the importance of having the witness examined and cross-

---

passwords, records, and items of identification"); 37-12 (note to Plaintiff's Employee file dated July 30, 2020 stating that although Plaintiff "insisted she didn't [alter Ms. Friedline's timecard, the next morning] it was discovered she was doing time changes on many people"). *Compare* Docket No. 37-9 (Defendant's forensic analysis report identifying no anomalies to any other employee's timecards); n. 14, *supra.*

[28] *Cf.* n. 14, *supra*. *Cf. also* Docket No. 44 at 7 (Defendant's Reply, averring that: "It was [subsequently] discovered that [Ms. Friedline]'s timecard was shorted nearly five times as many hours as additionally [*sic*] believed.") (citing Docket No. 35-9).

[29] To the extent Defendant asserts - in the alternative to relying on the findings of its October, 2023 forensic analyst's report - that the inquiry "should be whether the decision-makers, at the time of their decision, honestly believed that Plaintiff was insufficiently performing the required duties of her position" and answered in the affirmative because "Defendant clearly had an honest belief that Plaintiff was committing accounting errors after discovering objective proof of the errors on Kerri's timecards", it does not alter the Court's conclusion that a reasonable jury could find that Defendant's proffered reason for termination was not its true one.  (Docket No. 44 at 8).

examined in the presence of the court and jury." *Losch v. Borough of Parkesburg, Pennsylvania*, 736 F.2d 903, 909 (3d Cir. 1984). The relevant inquiry at this juncture is whether, from the evidence now available, a jury could reasonably infer that Defendant illegally discriminated against Plaintiff. *See e.g., Graham v. F.B. Leopold Co*., 779 F.2d 170, 173 (3d Cir. 1985). The Court answers that inquiry in the affirmative and accordingly denies Defendant's motion for summary judgment as to Plaintiff's ADEA discrimination claim.[30]

### 5. Plaintiff's Ultimate Burden

In denying summary judgment on this claim, however, the Court reminds the parties that to establish Defendant's liability under the ADEA, Plaintiff must ultimately convince the trier of

---

[30] Having found, through its analysis under the first prong of the *Fuentes* test, that Plaintiff is entitled to proceed on this claim, the Court need not and does not rely upon an analysis under the second prong. It notes, however, that it would be inclined to reach a different conclusion under the second prong, which looks to *affirmative* evidence that Defendant was motivated by discriminatory animus, *i.e.*, that age was the real reason for her termination. *Fuentes*, 32 F.3d at 762. This prong calls upon a plaintiff to identify evidence that the employer: (1) "previously discriminated against her," (2) "discriminated against other persons within her protected class or within another protected class," or (3) treated similarly situated individuals outside the protected class more favorably. *Simpson v. Kay Jewelers, Div. of Sterling, Inc*., 142 F.3d 639, 645 (3d Cir. 1998) (citing *Fuentes*, 32 F.3d at 765).

Relatedly, the Court finds that Owner's alleged inquiry into/suggestion of Plaintiff's retirement or possible termination of employment, and limitations on its admissibility under the Dead Man's Statute, need not be determined in its ruling on the pending motion. *See* Section II(A) at 9, *supra*; Docket No. 44 at 6 (noting that decedent's statements are inadmissible where: 1) deceased had an actual right or interest in the matter at issue; 2) the interest of the witness is adverse; and 3) the right of the deceased passed to a party of record who represents the deceased's interest).

It further notes that, even if admissible, the Court would be inclined to find that Owner's statements regarding Plaintiff's retirement were not inherently evidence of pretext or discriminatory intent. *See e.g.*, *Boston v. Blue Cross & Blue Shield of Kansas*, 431 F.App'x 763, 767 (10th Cir. 2011); *Rexses v. The Goodyear Tire & Rubber Co*., 401 F.App'x 866, 868 (5th Cir. 2010) ("An employer's inquiry into an employee's age and retirement plans is not by itself evidence of discriminatory intent"); *Colosi v. Electri-Flex Co*., 965 F.2d 500, 502 (7th Cir. 1992); *Misner v. Potter*, 2009 WL 1872598, *7 (D. Utah June 26, 2009) (distinguishing such inquiry from "trying to push out older executives because of stereotypes about age"); *Lefevers v. GAF Fiberglass Corp*., 667 F.3d 721, 724 (6th Cir. 2012) (retirement planning questions such as "[w]hen are you going to retire?" . . . do not satisfy plaintiff's burden to demonstrate age animus when unrelated to decisional process at issue); *Folcher v. Appalachian Insulation Supply*, Inc., 2007 WL 1544693, ** 3-4 (E.D. Pa. May 24, 2007) (supervisor comments that plaintiff was "getting older . . . when are you going to retire?" did not rise to coercive inquiry and would not themselves support inference of age bias). *Compare*, e.g., *Wargats v. Pittsburgh Tech. Inst*., 2007 WL 81056, **2, 6 (W.D. Pa. Jan. 8, 2007) (denying summary judgment where employer questioned plaintiff about expected retirement frequently, even after plaintiff said he had no such plans to retire, and plaintiff presented other evidence of pretext); *Romantine v. CH2M Eng'rs, Inc*., 2010 WL 5419017, **12-13 (W.D. Pa. Nov. 24, 2010).

fact that a *discriminatory animus was the real reason* for the adverse employment action at issue. *Fuentes*, 32 F.3d at 765. "Liability cannot be established upon a jury's mere disbelief of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's affirmative belief of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." *Venter v. Potter*, 694 F.Supp.2d 412, 423 (W.D. Pa. 2010), *aff'd*, 435 D.Appx. 92 (3d Cir. 2011) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 519) ("It is not enough, in other words, to disbelieve the employer; *the factfinder must believe the plaintiff's explanation of intentional discrimination*.") (emphasis added).[31] To that end, "[e]vidence that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000)).  The Court has found only – on considering the evidence before it as a whole and under the standards explicated above – that a reasonable jury could so conclude.

B.     **Plaintiff's Evidence is Insufficient to her Claims of Gender Discrimination**

Plaintiff's response in opposition to Defendant's motion for summary judgment avers, in support of her claims of gender discrimination under Counts III (Title VII) and IV (PHRA), that (a) she was "initially replaced by a male [Owner] immediately after her termination before [her replacement] Miller was hired" and (b) Owner treated "male employees who worked in the garage area differently from female employees who worked in the office".  (Docket No. 40 at 19-20) ("In

---

[31] *See also McLaughlin v. International Brotherhood of Teamsters, Local 249*, 641 F. Supp. 3d 177, 205 (W.D. Pa. 2022) (noting that employee's age must have "actually played a role in the employer's decision-making process and had a determinative influence on the outcome of that process").

particular, male employees working in the garage 'clocked out' for lunch while [Plaintiff] was forced to eat lunch at her desk while continuing to work. . . . During the three to fourth month period following her termination, [Owner] assumed many of [Plaintiff]'s job Responsibilities.") (citing Plaintiff's deposition testimony). *See also* Docket No. 35-5 at 15-17 (averring in support of gender "harassment" claim that male garage employees received a half-hour morning break and "mostly" a paid lunch while female office staff were not permitted non-lunch breaks).

First, these allegations are facially insufficient to a claim of gender discriminatory treatment premised on break or lunch hour employment terms (*e.g.*, garage employees performing tasks reasonably requiring pre-lunch clean-up and a separate eating area and not requiring continuous coverage of those tasks are not "similarly situated" to office employees performing administrative/office desk tasks, including coverage of phones and interactions with customers/suppliers). *See* Docket No. 44 at 8-9 (asserting, correctly, that Plaintiff fails as a matter of law to provide evidence of a similarly-situated individual treated more favorably) (providing case citations).[32]    Second, the allegations raised are similarly insufficient to a claim of gender discriminatory termination.   *See* Docket No. 44 at 10 (observing with case citation that Owner's performance of Plaintiff's duties during an interval following her termination did not constitute his "replacement" of her for purposes of gender discrimination claim). *See also* nn. 3 and 16, *supra*. *Cf.* Docket No. 40 at 4-8 (Plaintiff's discussion of her ADEA claim and her replacement by Susan Miller).   In addition, Plaintiff's under-developed averments of gender discrimination are largely unsupported – clearly insufficiently supported - by record evidence.

---

[32] Although Plaintiff testifies that Lyons, a male office worker, was treated differently, her testimony is that he was allowed a break and "sometimes went up with the guys for their break in the lunchroom" because "he was a smoker". (Docket No. 35-5 at 16-17).

**C.      Plaintiff Fails to Support Any Other Initially Asserted or Suggested Claims**

As noted *supra*, Plaintiff's Brief in Opposition advances only her claims for age discriminatory termination and gender discrimination.  To the extent her Amended Complaint included/retained references to other claims, such as retaliation, hostile work environment and/or harassment, they are  legally undeveloped and/or factually unsupported and – given the absence of more sufficient pleading, discovery and proffer of relevant evidence - Plaintiff simply has failed to state a prima facie case as to any.  Given the absence of presentation of evidence or meaningful application of the various elements of those mentioned but substantially un-litigated claims in Plaintiff's pleadings, the Court need not address them further.[33]

**D.      Evidentiary Considerations Raised by Defendant**

As observed at n. 30, *supra*, the Court also need not, at this juncture, further address the admissibility of testimony regarding statements made by Owner prior to his death some months after Plaintiff's termination. *Cf.* Docket No. 36 at 7-8; *supra* at 9.  Plaintiff's position as to her claim of age discriminatory termination is sufficiently supported by her other testimony and evidence of record to present material fact questions for a jury, and the insufficiency of any other claim is unaltered regardless of the Court's consideration of Owner's alleged discriminatory

---

[33] In response to Defendant's discovery request that Plaintiff identify instances of age and gender discrimination, harassment and retaliation, Plaintiff points first to Defendant's Covid policies and second to Plaintiff's age-discriminatory termination. (Docket No. 35-7 at 25-26).  *See also* Docket No. 36 at 6 (noting Plaintiff's repeated citation of Defendant's failure to enforce Covid protocols as the basis for her allegations of hostile work environment).

 The Court notes that the only complaint specified in the Amended Complaint was made to Owner and his wife and regarded Plaintiff's "discomfort" with Defendant's failure to enforce masking. (Docket No. 9 at ¶ 37).  *See also e.g.*, Docket No. 35-7 at 23-24 (attesting to making multiple Covid policy complaints to Defendant); *id.* at 8 (Plaintiff's assertion that Defendant's refusal to observe/enforce masking constituted "harassment", "targeted" older employees who were more susceptible, and Plaintiff was "forced . . .. to endure this work environment on a daily basis"); *id.* at 20-22) (asserting that Defendant recognized Plaintiff's membership in a vulnerable subclass and implemented illegal workplace policies "to harass Plaintiff and create a hostile work environment for her").  As Defendant duly observes, Plaintiff provides no case support for her novel theory.

statements.

## V.    CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (Docket No. 35) is denied as to Plaintiff's ADEA and PHRA claims for age discriminatory termination at Counts I and II, and granted as to all other claims.  An appropriate Order follows.


Dated:  March 3, 2025


                                        _/s/ Nora Barry Fischer_
                                        Nora Barry Fischer,
                                        Senior U.S. District Judge


cc/ecf: All counsel of record